<u>PUBLISH</u>

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

Filed / Docketed
August 13, 2007

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HENTGES, MICHAEL E., | ) | Case No. 06-10451-R |
| | ) | Involuntary Chapter 7 |
| Debtor. | ) | |

| | | |
|---|---|---|
| VIRGINIA D. MARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 07-1020-R |
| | ) | |
| MICHAEL E. HENTGES, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER GRANTING IN PART AND DENYING IN PART
### <u>DEFENDANT'S CORRECTED MOTION FOR SUMMARY JUDGMENT</u>

Before the Court is Defendant's Corrected Motion for Summary Judgment (Adv. Doc.

13) (the "Motion"), filed by Defendant Michael E. Hentges ("Mr. Hentges") on April 4,

2007; the Corrected Memorandum in Support of Defendant's Corrected Motion for Summary

Judgment (Adv. Doc. 16), filed by Mr. Hentges on April 5, 2007 (the "Defendant's Brief");

and Plaintiff's Response to Defendant's Motion for Summary Judgment (Adv. Doc. 20)

("Plaintiff's Response"), filed by Plaintiff Virginia D. Marks ("Mrs. Marks") on April 23,

2007.

## I.    Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334,

157(a), and 157(b)(2)(I); and Local Civil Rule 84.1(a) of the United States District Court for

the Northern District of Oklahoma.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c), made applicable to this proceeding by Bankruptcy Rule 7056. A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Wright *ex rel*. Trust Co. of Kansas v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001), *citing* Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670, *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Mr. Hentges, as the moving party, bears the initial burden of demonstrating an absence of a genuine issue of material fact *and* entitlement to judgment as a matter of law. See Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir. 2002), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

If Mr. Hentges meets his initial burden, the burden shifts to Mrs. Marks, as the nonmoving party, to "set forth specific facts showing that there is a genuine issue for trial." Spaulding, 279 F.3d at 904, *citing* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Liberty Lobby, 477 U.S. at 248. Mrs. Marks may not simply rest upon her pleadings to satisfy her burden. Liberty Lobby, 477 U.S. at 256. Rather, she must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, 218 F.3d 1190, 1197 (10th Cir. 2000), *quoting* Adler, 144 F.3d at 671. To accomplish this, the facts

"must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (quotations and citation omitted).

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. Reasonable inferences that may be made from the proffered evidentiary record should be drawn in favor of the non-moving party, in this case, Mrs. Marks. See Adams, 233 F.3d at 1246. However, "[i]f the [non-moving party's] evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. Conversely, even where a movant's facts are undisputed, if two reasonable factfinders could reach different conclusions or "ultimate inferences" from the undisputed facts, summary judgment is not warranted. See Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1382 (10th Cir. 1980).

## III.   Evidentiary Issues

On May 2, 2007, Mr. Hentges filed a Motion to Strike (Adv. Doc. 23), in which he objects to the admissibility of Exhibit C to Plaintiff's Response, contending that the records contained in the exhibit lack a proper foundation and constitute inadmissible hearsay. Mr. Hentges also contends that the introductory page of the exhibit appears to be a summary of materials not attached to the exhibit, and therefore the summary does not comply with

Federal Rule of Evidence 1006.  Finally, Mr. Hentges argues that the exhibit does not support the proposition for which it is cited.

In Plaintiff's Response to Motion to Strike (Adv. Doc. 26), Mrs. Marks contends that the documents are bank records that are self-explanatory, and in essence, self-authenticating, and that the summary is an accurate summary of the disposition of funds from accounts into which funds loaned by Mrs. Marks were deposited.[1]

Documents submitted in support of or in opposition to a motion for summary judgment "must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) [of the Federal Rules of Civil Procedure] and the affiant must be a person through whom the exhibits could be admitted into evidence."  Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550-51 (9th Cir. 1990) (citation and quotation omitted).  Because the bank records contained in Exhibit C are not authenticated by an affidavit or otherwise, and Mr. Hentges does not stipulate to their authenticity, the Court grants the Motion to Strike.

## IV.    Record on Summary Judgment

### A.    Undisputed Material Facts

The following material facts are uncontested and are supported by the record:[2]

---

[1]Mrs. Marks also argues that the exhibit is submitted to contest inaccurate statements of fact made by Mr. Hentges in Defendant's Brief.  She further asserts that because Mr. Hentges is precluded by prior orders from relitigating certain facts, those allegedly inaccurate statements of fact are irrelevant.  As later set forth in this order, however, the record is insufficient to assess whether prior orders preclude relitigation of any issues in this proceeding.

[2]These Statements of Undisputed Facts ("SUF") were asserted in Plaintiff's Motion for Summary Judgment (Adv. Doc. 6), supported by Plaintiff's Corrected Memorandum in

For approximately twenty years prior to 2005, Mr. Hentges acted as investment advisor and life insurance broker for Mrs. Marks and her now deceased husband, Leslie Marks, and as such, held a position of trust and confidence with respect to Mrs. Marks. Mrs. Marks's Motion, Statement of Undisputed Facts ("SUF") ¶ 1; Mr. Hentges's Response, Response to Plaintiff's Alleged Undisputed Facts ("Response to SUF") ¶ 1.

Mr. Hentges was a licensed insurance broker. On October 1, 1999, Mr. Hentges sold the Leslie D. Marks Trust a $410,000 whole life insurance policy through Columbus Life Insurance Company ("Columbus") insuring the life of Virginia D. Marks (the "Life Insurance Policy"). The beneficiary of the policy is the Virginia D. Marks Trust. SUF ¶ 2; Response to SUF ¶ 2 (does not controvert with admissible evidence).

In September through November 2003, Mr. Hentges approached the Marks for the purpose of securing a series of short-term loans, which Mr. Hentges suggested to the Marks they could fund by borrowing against the Life Insurance Policy sold to them by Mr. Hentges. Complaint (Adv. Doc. 1) ¶ 7; Answer (Adv. Doc. 4) ¶ 7.

The first note ("Note A"), dated September 9, 2003, memorialized the promise of 76 PW, LLC ("76 PW") "to pay to Virginia Marks the principal sum of Twenty Five Thousand and No/100 Dollars ($25,000.00), together with interest thereon at the rate of Five Percent (5%) per month . . . due and payable on December 8, [2]003." SUF ¶ 5; Response to SUF

---

Support of Motion for Summary Judgment (Adv. Doc. 10) ("Mrs. Marks's Motion"), and Mr. Hentges's responses to the SUFs ("Response to SUF") are included in the Corrected Response to Plaintiff's Motion for Summary Judgment (Adv. Doc. 18) ("Mr. Hentges's Response"). It appears that the parties assumed the Court's familiarity with these facts when they filed the pleadings addressed in this order.

¶ 5.  Mr. Hentges signed Note A as the Manager of 76 PW.  Note, attached to Complaint as Exhibit B.  See also Defendant's Statement of Undisputed Facts ("DSUF"), Defendant's Brief at 6, ¶ 7; Plaintiff's Response at 7, ¶ 7.

The second note ("Note B"), dated September 23, 2003, memorialized the promise of Real Estate Marketing Services, LLC ("REMS") "to pay to Virginia Marks the principal sum of Fifty Thousand and No/100 Dollars ($50,000.00), together with interest thereon at the rate of Five Percent (2%) [sic] per month . . . due and payable on December 15, [2]003."  SUF ¶ 7; Response to SUF ¶ 7.  Mr. Hentges executed Note B as Manager of REMS.  Note, attached to Complaint as Exhibit C.  Mr. Hentges personally guaranteed the obligation owing under Note B.  SUF ¶ 8; Response to SUF ¶ 8.

The third note ("Note C"), dated November 18, 2003, memorialized the promise of REMS "to pay to Virginia Marks the principal sum of Twenty Five Thousand and No/100 Dollars ($25,000.00), together with interest thereon at the rate of Two Percent (2%) per month . . . due and payable on February 18, [2]003."  SUF ¶ 10; Response to SUF ¶ 10.  Mr. Hentges executed Note C as Manager of REMS.  Note, attached to Complaint as Exhibit D. Mr. Hentges personally guaranteed the obligation owing under Note C.  SUF ¶ 11; Response to SUF ¶ 11.

Mr. Hentges admitted on January 4, 2004, that Note A and Note B were past due and in default, but represented to the Marks that if REMS could borrow an additional $100,000, it could close several business deals and repay the principal and accrued interest on all the Notes.  SUF ¶ 12; Response to SUF ¶ 12 (not controverted by admissible evidence).

The fourth note ("Note D"), dated January 20, 2004, memorializes the promise of REMS to pay Mrs. Marks and her husband "the principal sum of One Hundred Thousand and No/100 Dollars ($100,000.00), together with interest thereon at the rate of Eight Percent (8%) per annum until all principal and interest due and owing are paid." SUF ¶ 14; Response to SUF ¶ 14. Note D was due and payable on January 20, 2005. Note, attached to Complaint as Exhibit E. Mr. Hentges executed Note D as Manager of REMS. Id. Mr. Hentges personally guaranteed the obligation owing under Note D. SUF ¶ 15; Response to SUF ¶ 15.

Mrs. Marks received payments totaling $54,000 on the Notes described above. SUF ¶ 16; Response to SUF ¶ 16.[3] See also DSUF ¶ 8; Response at 6, ¶ 8.

By letter dated June 22, 2005, Mr. and Mrs. Marks, through their attorney, made demand for payment on all four Notes. SUF ¶ 17; Response to SUF ¶ 17.

By letter dated June 27, 2005, Cy Northrop, attorney for Mr. Hentges, responded to the demand letter and admitted Mr. Hentges's liability on the Notes. Through the letter, Mr. Hentges offered to enter into a settlement of his liability on the Notes, which included a reduction in the amount then due, a cancellation of the four Notes, and the execution by Mr. Hentges of a new installment note extending repayment of the reduced amount over three

---

[3]The parties assert that $54,000 was paid by Mr. Hentges. Although not set forth in the Motion, the Court takes judicial notice of Adversary Proceeding No. 06-1185-R, Steven W. Soule, Trustee, v. Virginia D. Marks, in which Mrs. Marks was sued by the trustee of the bankruptcy estate of 76 PW, in order to recover $27,636.71 from Mrs. Marks as a preferential payment made within ninety days prior to the date Mr. Hentges authorized 76 PW, to file its bankruptcy petition. The trustee alleged that within the preference period, 76 PW paid $27,636.71 to Mrs. Marks in repayment of Note A. Mrs. Marks alleged that Mr. Hentges transferred funds to 76 PW to make the payment and therefore the payment was actually made with Mr. Hentges's funds, not those of 76 PW. The Court further notes that Mrs. Marks and the trustee settled the proceeding under terms in which Mrs. Marks will pay $11,909.00 to the trustee.

years with six percent interest. SUF ¶ 18; Response to SUF ¶ 18. <u>See also</u> DSUF, ¶ 10.[4] Mr. Northrop also stated that Mr. Hentges was unable to make a payment at that time, that if he lost his insurance license his ability to pay would be hampered, that he would not pay the "high interest rates called for in the notes," that he would not make a partial payment on a past due note, and that he would not pay if he was sued by the Marks. Letter, Exhibit F to Verified Petition (Exhibit 1) attached to Mrs. Marks's Motion; Response to SUF ¶ 18.

On July 1, 2005, Mr. and Mrs. Marks filed a lawsuit against Mr. Hentges and the makers of the Notes in the District Court for Tulsa County, Oklahoma (the "Tulsa County Lawsuit"), alleging, *inter alia,* a claim on each Note, including a claim against Mr. Hentges on his guarantee, and claims against Mr. Hentges for fraud, negligence, professional negligence, and breach of fiduciary duties. SUF ¶ 19 and Verified Petition, Exhibit 1 to Mrs. Marks's Motion; Response to SUF ¶ 19.

With respect to the fraud claim, Mrs. Marks alleged –

> 65.   As the financial advisor for the Marks for the last twenty (20) years, Hentges has held a position of trust and confidence.

> 66.   Between September 9, 2003, and January 20, 2004, Hentges, individually and as agent of Columbus, 76 PW, and REMS, used his position of trust and confidence to fraudulently coerce the Marks into advancing four (4) loans totaling $200,000, which were funded pursuant to a transaction arranged by Hentges utilizing his agency relationship with Columbus to obtain the principal of the note from the Life Insurance Policy.

---

[4]In his DSUF ¶ 10, Mr. Hentges characterizes the Northrop letter as an offer to pay the "full balance on the relevant notes by issuing a replacement note." However, in the letter, Mr. Hentges offered to execute a new note for a reduced amount at a lower interest rate, payable over three years, in exchange for a cancellation of the original Notes (and, apparently, a release of the original payors), which was not the same as an offer to pay the full balance on the Notes.

67.     As inducement for the Marks to provide each loan, Hentges willfully and intentionally misrepresented the date that all principal and accrued interest under each promissory note would be paid in full.

68.     The Marks relied on Hentges's misrepresentations when they advanced each loan.

69.     As inducement for the Marks to provide the loan with respect to Note D, Hentges willfully and intentionally misrepresented the date that all principal and interest under Note A and Note B would be paid in full.

70.     The Marks relied on Hentges's misrepresentations when they advanced the loan related to Note D.

71.     By letter from Cy Northrop dated June 27, 2005, the Marks are now informed that unless they agree to renegotiate the promissory notes, "the Marks will never get paid."

72.     As a direct result of the fraudulent misrepresentations made by Hentges, the Marks have been damaged in an amount in excess of $10,000, plus attorney's fees and costs.

Verified Petition, Exhibit 1 to Mrs. Marks's Motion.

Mr. Hentges filed an Answer in the Tulsa County Lawsuit and asserted a Counterclaim against the Marks, contending that they had "extorted" a $54,000 payment from Mr. Hentges by filing administrative complaints against Mr. Hentges with the Oklahoma Insurance Commissioner and the Oklahoma Department of Securities. SUF ¶ 20; Response to SUF ¶ 20.

On August 31, 2005, Mr. Hentges filed an Offer of Judgment in the Tulsa County Lawsuit. The Offer of Judgment stated, *in toto*, that "[p]ursuant to Oklahoma Statutes Title 12 Section 1101.1(B), Michael E. Hentges offers to confess a judgment in the amount of $185,000.00, exclusive of any fees or costs deemed to be recoverable[.]" SUF § 21 and Offer of Judgment, Mrs. Marks's Motion Exhibit 3; not controverted. The Marks accepted the

Offer of Judgment on September 2, 2005, and on September 21, 2005, the Tulsa County

District Court entered a "Judgment by Confession."  SUF ¶ 22; Judgment by Confession,

Mrs. Marks's Motion Exhibit 4; not controverted.[5]

The Judgment by Confession states, in pertinent part–

Comes now, Plaintiffs Virginia D. Marks, individually and as Trustee of the Virginia D. Marks Trust and Leslie D. Marks, individually and as Trustee of the Leslie D. Marks Trust ("Plaintiffs") and advise the Court that Defendant, Michael E. Hentges, has offered to confess Judgment in the amount of $185,000.00 and Plaintiffs have accepted the offer of confession, as evidenced by the Notice of Acceptance of Offer to Confess Judgment filed on September 2, 2005.  The Plaintiffs have requested that the Court enter this Judgment by Confession.  For good cause and proper grounds presented the Court FINDS that this Judgment by Confession should be approved.

IT IS THEREFORE ORDERED that Plaintiffs are awarded judgment against Michael E. Hentges in the sum of $185,000.00 for which general execution shall issue and interest shall accrue at the rate of 7.25% as provided in 12 O.S. § 727[I].

Judgment by Confession, Mrs. Marks's Motion Exhibit 4.  Mr. Hentges dismissed his

Counterclaim without prejudice.  SUF ¶ 22; not controverted.

Mr. Hentges has not paid any of the Judgment by Confession.  SUF ¶ 25; Response

to SUF ¶ 25.

---

[5]Mr. Hentges objected to and moved to strike SUF ¶¶ 21 and 22, contending that pursuant to section 1101.1 of Title 12, the Offer of Judgment and Mrs. Marks's acceptance thereof is inadmissible.  Section 1101.1(D) states that "[e]vidence of an offer of judgment or a counteroffer of judgment shall not be admissible in any action or proceeding for any purpose except in proceedings to enforce a settlement arising out of an offer of judgment or counteroffer of judgment, or to determine reasonable attorneys fees and reasonable litigation costs under this section."  12 O.S. § 1101.1(D).  Because this proceeding is an action to enforce a settlement arising out of an offer of judgment, Section 1101.1(D) does not preclude the admission of evidence of Mr. Hentges's Offer of Judgment, Mrs. Marks's acceptance of the Offer of Judgment, and the Judgment by Confession.  Accordingly, Mr. Hentges's motion to strike SUF ¶¶ 21 and 22 has been denied.  See Order Denying Plaintiff's Motion for Summary Judgment at 9, n.2.

On September 28, 2005, Mr. Hentges appeared before an administrative law judge (the "ALJ") for the Oklahoma Insurance Commission for a hearing based upon complaints filed by Mrs. Marks and another individual.  Order Revoking License of Michael Edmund Hentges ("Revocation Order"), Mrs. Marks's Motion Exhibit 6.[6]  On October 27, 2005, after a hearing on the merits, the ALJ entered the Revocation Order based in part upon the following findings of fact and conclusions of law:

> 5.      [Mr. Hentges] used his relationship as the insurance agent and financial advisor to induce Mrs. Marks to make the above loans. . . .
>
> *****
>
> 8.      In his dealings with Mrs. Marks, [Mr. Hentges] was dishonest in his promises of repayment of loans and in the transfer of those funds from one business to another which he either owned or had a financial interest.  As her insurance agent, he breached his fiduciary relationship to the detriment of Mrs. Marks and to his benefit and that of his business ventures.
>
> *****
>
> Conclusions of Law
>
> *****
>
> 3.      The evidence presented is clear and convincing that [Mr. Hentges] had a fiduciary relationship with Mrs. Marks as an insurance client, that he did not make a full disclosure as to how the money was to be used, that he did not advise as to the viability of Real Estate Marketing Services, and that he was untruthful when he made the terms of repayment and defaulted on the first payment of each note.  If not dishonest, then he was an incompetent businessman.
>
> *****
>
> 5.      The evidence is clear and convincing that [Mr. Hentges] used dishonest practices in the borrowing of money from Mrs. Marks and Ms. Kelly for

_____

[6]Although Mr. Hentges disagrees with the findings of fact contained in the Revocation Order, he did not controvert the fact that the order was entered.

enterprises in which he had a substantial financial interest including some which could not pay its [sic] bills.

6.      The evidence clearly shows [Mr. Hentges's] untrustworthiness and incompetence in using information he had about the financial affairs of Mrs. Marks and Ms. Kelly to borrow money for ventures in which he had a substantial interest and for his benefit and his failure to repay and [in] defaulting on the first payment dates.

7.      [Mr. Hentges] was dishonest in his dealings with them and showed a total lack of integrity and honesty, which are character traits essential to a person being licensed as an insurance producer in the State of Oklahoma.

Revocation Order.[7]  The Revocation Order was affirmed on Mr. Hentges's appeal to the District Court for Oklahoma County.  SUF ¶ 24; Order dated October 4, 2006, Mrs. Marks's Motion Exhibit 7; not controverted.  The District Court found "substantial evidence to support the decision of the hearing officer[,] . . . [that] Appellant's rights were not prejudiced[, and that] Appellant had clear notice of everything proffered" at the Insurance Commission proceeding.  Order dated October 4, 2006, at 1.

## B.      Defendant's Statement of Other Undisputed Facts

Mrs. Marks stated in her deposition that, to her knowledge, Mr. Hentges had not committed any act of dishonesty or deceit against her.  Defendant's Statement of Undisputed Facts ("DSUF"), Defendant's Brief at 5, ¶ 1;  Transcript, Defendant's Brief Exhibit 2, at 32-33.  Mrs. Marks also answered "no" when asked by Mr. Hentges's counsel whether she had evidence that Mr. Hentges was "a fraud or a crook or a thief or anything like that."  Id. at 46.  However, Mrs. Marks also admitted that she is unaware of the legal boundaries of the term

---

[7]Mr. Hentges objected to the relevance of the Revocation Order.  Response to SUF ¶ 23.  Concluding that the Revocation Order would be relevant and admissible at trial, the Court has overruled the objection.  See Order Denying Plaintiff's Motion for Summary Judgment.

"fraud." Id. at 33.  She further stated she felt he deceived her in representing that she would be paid and that when it was time to be paid, he claimed that there was no money to pay the Notes.  Id. at 75.  Mrs. Marks admitted that she believed that the investments she made through Mr. Hentges were generally successful, except for the Notes.  DSUF ¶ 2; Transcript at 31-32.

Mr. Hentges did not receive the money loaned by Mrs. Marks (DSUF ¶ 4).[8]  Mr. Hentges did not have an ownership interest REMS, and did not receive commissions or an economic benefit from REMS (DSUF ¶ 5).[9]

Mr. Hentges also contends that he guaranteed only the three Notes issued by REMS (DSUF ¶ 6). Mrs. Marks denies that Mr. Hentges guaranteed only three of the Notes, contending that after 76 PW defaulted on Note A, Mr. Hentges promised to pay Note A, citing statements made by Mr. Hentges at a meeting with Mrs. Marks on February 15, 2005 (the "February 15, 2005, Meeting"), which was tape-recorded by Mrs. Marks.  Plaintiff's Response at 6, ¶ 6, and Plaintiff's Response, Exhibit D.  Whether Mr. Hentges guaranteed three or four of the Notes is not relevant to whether Mr. Hentges is entitled to judgment as a matter of law, however.

_____

[8]Mrs. Marks denies that Mr. Hentges did not obtain the money from the Notes, Response at 6, ¶ 4, but because the exhibit relied upon by Mrs. Marks to support her denial was stricken as unauthenticated, she has failed to refute the statement with admissible evidence.

[9]Mrs. Marks denies that Mr. Hentges did not receive an economic benefit from REMS, Response at 6, ¶ 5, but because the exhibit relied upon by Mrs. Marks to support her denial was stricken as unauthenticated, she has failed to refute the statement with admissible evidence.

## V.      Conclusions of Law

### A.      Section 523(a)(4)

Mrs. Marks contends that Mr. Hentges's debt is non-dischargeable under Section 523(a)(4).  Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  "[A]n express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4)."  <u>Fowler Bros. v. Young (In re Young)</u>, 91 F.3d 1367, 1371 (10th Cir. 1996).  "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith . . . nor an inequality of bargaining power . . . is sufficient to establish a fiduciary relationship for purposes of dischargeability."  <u>Id</u>. at 1372 (citations omitted).  Moreover, the trust creating the fiduciary capacity must have been expressly established or imposed prior to an alleged tortious action that created the debt.  <u>Id</u>

Thus, a trust implied by law as a consequence of wrongdoing–a constructive trust or resulting trust, for example–does not create the fiduciary capacity contemplated by Section 523(a)(4). <u>Id</u>.  <u>See also</u> <u>Tway v. Tway (In re Tway)</u>, 161 B.R. 274, 278 (Bankr. W.D. Okla. 1993), *citing* <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 333 (1934).  Rather, Section 523(a)(4) presupposes a defalcation, that is, a misappropriation or misapplication, of money or property entrusted to the debtor under an express or technical trust.  <u>Id</u>. at 1371.   The express or technical trust may arise under a trust agreement, or it may be imposed by statute. <u>See</u> <u>Tway</u>, 161 B.R. at 279.  In either event, the trust agreement or statute must identify the *res, i.e*., the property that has been entrusted to the debtor, and describe the debtor/trustee's duties with respect to the property.  <u>Id</u>. at 279, 281.

14

The material facts in the <u>Fowler</u> case are analogous to the facts of this case.  In <u>Fowler</u>, the creditor was a construction contractor who performed services for the debtor, and the debtor was also the contractor's attorney.  <u>Fowler</u>, 91 F.3d at 1370.  The contractor and attorney performed services for each other over a period of years, and at some point, the attorney owed the contractor more than the contractor owed the attorney, and that amount was memorialized by a note executed by the attorney.  <u>Id</u>.  Although the state rules of professional conduct precluded attorneys from entering into transactions with clients unless the attorney made certain written disclosures, advised the client to seek independent legal advice, and obtained the client's written consent, the attorney in this case did none of these things during the course of their relationship.  <u>Id</u>. at 1373-74.  After a certain amount of time had passed, the contractor sought to enforce the attorney's note and the attorney claimed that the debt was barred by the statute of limitations.  <u>Id</u>.  The contractor sued the attorney and the parties settled, resulting in the entry of a consent judgment against the attorney.  <u>Id</u>.  After the attorney filed bankruptcy, the contractor sought to except the judgment from discharge under Sections 523(a)(2) and (a)(4).

The contractor had alleged that the attorney violated rules of professional conduct by failing to advise him of potential conflicts of interest in connection with their dual relationship, and by failing to advise him that he should seek independent legal advice regarding the serial business transactions and enforcement of the note.  Although the debtor/attorney may have had duties of confidence, trust, loyalty and good faith vis-a-vis his client, which are the distinctive duties of a fiduciary, the contractor/client had not entrusted money or property to the attorney (such as placing money in escrow or in the attorney's trust

15

account), and therefore no express trust has been created.  Id. at 1371-73.  The Tenth Circuit

held that the rules of professional conduct did not create a fiduciary relationship of the nature

required by Section 523(a)(4).

The Tenth Circuit did conclude, however, that the attorney's failure to disclose

information that he had a duty to disclose to his client with respect to the overall transactions

and the note were material omissions that constituted "false representations," and that if all

other elements were met, the debt obtained by such "false pretenses" could be excepted from

discharge under Section 523(a)(2).  Id. at 1374-75.

The relationship between Mrs. Marks and Mr. Hentges is analogous to that of the

contractor and attorney in Fowler.  Mr. Hentges, as Mrs. Marks's insurance, financial and

investment advisor, had been in a unique position to influence her insurance and investment

decisions, and the Oklahoma Insurance Commission disciplined him for failing to measure

up to the insurance profession's ideals of trust, confidence and integrity when he breached

fiduciary duties to Mrs. Marks.  However, Mr. Hentges did not acquire any money or

property in trust, but rather induced Mrs. Marks to invest in the four Notes, which were, in

essence, securities,[10] in companies he managed or controlled.  Although Mr. Hentges may

not have fully disclosed information about the companies or the nature or risk of the

securities before he induced Mrs. Marks to invest, it is undisputed that he did not accept

money as a trustee.  He admits liability for breaching his guaranty of the Notes.  However,

---

[10]Under Oklahoma law, the definition of "security" includes a "note," "evidence of
indebtedness" and "investment contract."  71 O.S. § 1-102(32).

16

a breach of contract by a fiduciary is not, without more, a defalcation while acting in a fiduciary capacity.

In Plaintiff's Response, Mrs. Marks also contends that Mr. Hentges's conduct constituted embezzlement or larceny.  Under Section 523(a)(4), embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.  See Klemens v. Wallace (In re Wallace), 840 F.2d 762, 765 (10th Cir.1988); Hill v. Putvin (In re Putvin), 332 B.R. 619, 627 (B.A.P. 10th Cir. 2005); Cousatte v. Lucas (In re Lucas), 300 B.R. 526 (B.A.P. 10th Cir. 2003); Bryant v. Tilley (In re Tilley), 286 B.R. 782, 789 (Bankr. D. Colo. 2002).  Consequently, embezzlement requires proof of a defalcation or misappropriation of property by one to whom it is entrusted, plus proof of fraudulent intent.

Because Mrs. Marks cannot establish that property was entrusted to Mr. Hentges for the purpose of proving "defalcation while acting as a fiduciary" (which results in an exception to discharge even in the absence of  any wrongful intent),[11] neither can she establish embezzlement.  Again, Mrs. Marks loaned money to 76 PW and REMS, albeit at Mr. Hentges's request and suggestion, by writing checks directly to those entities.  Although Mrs. Marks entrusted *the checks* to Mr. Hentges, Mrs. Marks does not offer any evidence that

---

[11]See, e.g., Antlers Roof-Truss & Builders Supply v. Storie (In re Storie), 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997) ("defalcation under section 523(a)(4) is a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, wilful, reckless, or negligent.").

Mr. Hentges did not deliver the checks to the intended entities or that the loan proceeds were not deposited into the entities' accounts. Accordingly, the undisputed facts establish that Mr. Hentges did not embezzle funds from Mrs. Marks.

Larceny is the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." Bryant v. Lynch (In re Lynch), 315 B.R. 173, 179 (Bankr. D. Colo. 2004) (remanded on other grounds). Mrs. Marks does not allege or submit any evidence that Mr. Hentges feloniously took her property (that is, took property without her consent) with an intent to permanently deprive her of it. The most she alleges is that Mr. Hentges requested that she loan funds to 76 PW and REMS, to which she consented, that Mr. Hentges caused 76 PW and REMS to deposit the loan proceeds into their accounts, and that thereafter Mr. Hentges transferred funds from 76 PW and REMS to himself or entities in which he had an interest. At the point Mrs. Marks contends Mr. Hentges obtained the benefit of the loaned funds, the funds were no longer property of Mrs. Marks. The subsequent transfer of funds did not require Mrs. Marks's consent. Thus, Mr. Hentges could not have feloniously taken the funds from Mrs. Marks. Accordingly, Mrs. Marks cannot prevail on a claim that Mr. Hentges's debt is a result of larceny.

Under the undisputed facts, Mrs. Marks cannot establish an exception to discharge pursuant to Section 523(a)(4) and summary judgment therefore is granted in favor of Mr. Hentges on Mrs. Marks's Section 523(a)(4) claim.

B.      Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt –

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  Generally, to obtain a judgment that a debt is not dischargeable under this section, a creditor must prove–

(1) That a representation was made by the debtor;

(2) That the representation was false;

(3) That the representation was made with the intent to deceive the creditor;

(4) That the creditor relied upon the representation; and

(5) That, as a result of such reliance, the creditor suffered loss.

Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir. 1996).  In addition, the creditor must prove that reliance on the representation was justifiable.  Field v. Mans, 516 U.S. 59, 74-75 (1995).

### 1.    *Representation by debtor that is false*

Mr. Hentges contends that Mrs. Marks admits that Mr. Hentges never committed any act of dishonesty or deceit against her.  In response to questioning by Mr. Hentges's counsel, Mrs. Marks stated that she did not feel Mr. Hentges was "dishonest" or that he "deceived" her, and she also answered "no" when asked by Mr. Hentges's counsel whether she has evidence that Mr. Hentges "is a fraud or a crook or a thief or anything like that."  Transcript, Plaintiff's Response Exhibit B, at 32-33, 46.  However, Mrs. Marks also admitted that she

is unaware of the legal boundaries of the term "fraud." <u>Id</u>. at 33.[12]  She further stated she felt

---

[12]Under Oklahoma law, various types of conduct may constitute fraud or deceit.  The tort of deceit includes–

1.    The suggestion, as a fact, of that which is not true by one who does not believe it to be true.

2.    The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.

3.    The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4.    A promise, made without any intention of performing.

76 O.S. § 3.  Further, under Section 58 of Title 15 of the Oklahoma Statutes, in connection with a contract, "actual fraud"–

consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

1.    The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.

2.    The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.

3.    The suppression of that which is true, by one having knowledge or belief of the fact.

4.    A promise made without any intention of performing it.

5.    Any other act fitted to deceive.

15 O.S. § 58.

20

Mr. Hentges deceived her in representing that she would be paid and that when it was time to be paid, he stated that there was no money to pay the Notes.  As stated below, failing to disclose material facts when one has a duty to disclose such facts is also a species of fraud, which Mrs. Marks, as a lay person, may not have understood when she was questioned by Mr. Hentges's counsel.  Thus, Mrs. Marks's responses to counsel's questions are not necessarily statements of fact, but rather a test of Mrs. Marks's ability to interpret complex legal concepts such as fraud and deceit.  Her testimony does not, by itself, negate the existence of a claim under Section 523(a)(2).

When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). Fowler, 91 F.3d at 1374-75.  Moreover, "false pretense[s] as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'" William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins), 298 B.R. 778, 788 (Bankr. D. Utah 2003), *quoting* Peterson v. Bozzano (In re Bozzano), 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994) (abrogated on other grounds).  "An overt misrepresentation is not required, because 'omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor."  Id.

The RESTATEMENT (SECOND) OF TORTS § 551(2) (1976) provides, in pertinent part–

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

>   (a) matters known to him that the other is entitled to know because of a *fiduciary or other similar relation of trust and confidence between them*; and

>   (b) matters known to him that he knows to be necessary to *prevent his partial or ambiguous statement of the facts from being misleading*; and . . .

>   (e) *facts basic to the transaction*, if he knows that the other is about to enter into it under a mistake as to them, and that the other, *because of the relationship between them*, the customs of the trade or other objective circumstances, *would reasonably expect a disclosure of those facts.*

Id. (emphasis added).  Further, under Oklahoma law,

>   "'[i]n determining whether there is a duty to speak, consideration must be given to the situation of the parties and matters with which they are dealing.'" Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp., 24 F.3d 1190, 1195 (10th Cir.1994)(*quoting* Silk v. Phillips Petroleum Co., 760 P.2d 174, 179 (Okla.1988)).  Those considerations may require either (1) an absolute positive duty to speak based on a fiduciary or similar duty, or (2) a duty to speak arising from a partial disclosure.  See Thrifty Rent-A-Car Sys., 24 F.3d at 1195.  The second duty is imposed because the speaker is "'under a duty to say nothing or to tell the whole truth.  One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.'" Id. (*quoting* Deardorf v. Rosenbusch, 201 Okla. 420, 206 P.2d 996, 998 (1949))[.]

Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1324 (10th Cir. 1998).  See also Varn v. Maloney, 1973 OK 133, 516 P.2d 1328, 1332.

In addition, under Oklahoma securities laws, "[a] person is liable to a purchaser if the person sells a security . . . by means of an untrue statement of material fact or an omission

to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading."  71 O.S. § 1-509.

Mr. Hentges admits that with respect to Mrs. Marks, as her insurance and investment advisor, he owed her fiduciary duties of confidence, loyalty and trust.  He admits that his role in the Notes was one of a investment advisor; he advised her to loan money to 76PW and REMS as investments.  Thus, like the attorney in <u>Fowler</u>, Mr. Hentges was a fiduciary for the purpose of determining the level of disclosure he was required to give to Mrs. Marks before inducing her to invest $200,000 in entities that he managed, and in the case of 76PW, an entity in which he had an ownership interest.

The Oklahoma Insurance Commission found that Mr. Hentges breached his fiduciary duties to Mrs. Marks and "did not make a full disclosure as to how the money was to be used, that he did not advise as to the viability of [REMS], and he was untruthful when he made the terms of repayment and defaulted on the first payment of each note."  Revocation Order at 5, ¶ 3.  Although the evidence was sufficient in that proceeding to justify revocation of Mr. Hentges's insurance license, from the material submitted on summary judgment, the Court cannot be certain what allegations were made and proven, and therefore the Court cannot accord collateral estoppel effect to the Commission's finding for the purpose of establishing a material omission that would constitute a false representation for the purpose of this dischargeability proceeding.[13]  However, the Commission's finding is sufficient to provide

_____

[13]In Oklahoma, "when an issue (or claim) is sought to be barred by an earlier judgment in another case, the party relying on the adjudication *dehors* the case then before the trial

some evidence that Mr. Hentges failed to disclose material information to which Mrs. Marks was entitled in connection with her investment in the Notes.   In addition, Exhibit D to Plaintiff's Response, the tape recording of the February 15, 2005, Meeting between Mr. Hentges and Mrs. Marks, provides additional evidence that Mr. Hentges failed to provide Mrs. Marks with information that he knew or should have known was material to Mrs. Marks's decision to invest $200,000 in the entities.   The content of the disclosures Mr. Hentges made to Mrs. Marks at the time he induced her to loan money to 76 PW and REMS as investments is an issue of fact that precludes summary judgment for either party.

2.   *Misrepresentation made with intent to deceive*

The evidence submitted by Mr. Hentges does not negate the element of intent to deceive.   In her deposition, Mrs. Marks states that she was confused about who was borrowing the funds and that she believed that she was loaning funds to Mr. Hentges, which could evidence an intent by Mr. Hentges to deceive Mrs. Marks into believing that the investments were sound.   In the tape recording of the February 15, 2005, Meeting, it appears that Mr. Hentges explains to Mrs. Marks for the first time the untenable financial status of REMS.  Mr. Hentges also explains, apparently for the first time, that he procured the $25,000

---

court must secure admission (for the record on appeal) of the entire judgment roll (or record proper) in the other case.  This rule applies whether a favorable decision on the point is sought by summary relief or by trial."  Salazar v. City of Oklahoma City, 1999 OK 20, 976 P.2d 1056, 1061 n.12.  The judgment roll or record proper "shall be made up from the petition, the process, return, the pleadings subsequent thereto, reports, verdicts, orders, judgments, and all material acts and proceedings of the court. . . ." Id. at 1061 n.11, *quoting* 12 O.S. § 32.1.

loan to 76 PW to cover a capital contribution owed by one of the owners and that it was that owner who actually promised to pay 5% per month interest, but that the owner denied any recollection of the borrowing or the interest rate. The failure to disclose such vital facts to Mrs. Marks (if true) indicates an intent to conceal facts that may have discouraged Mrs. Marks from making the loans. Thus, Mrs. Marks has submitted sufficient evidence of motivation or intent to deceive. Whether Mr. Hentges did in fact intend to deceive Mrs. Marks by failing to disclose material information is a disputed issue of fact that must be established at trial.

### 3. *Creditor justifiably relied on the misrepresentation*

"Justifiable reliance does not require the creditor prove he acted consistent with ordinary care and prudence. Instead, '[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.' A creditor is only required to make an investigation beyond the representations given where 'under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived.'" William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins), 298 B.R. 778, 792 (Bankr. D. Utah 2003), *quoting* Field v. Mans, 516 U.S. 59, 70-71(1995).

The fact that Mr. Hentges was Mrs. Marks's trusted insurance and financial advisor constitutes adequate circumstantial evidence that Mrs. Marks relied upon her relationship

with Mr. Hentges when she wrote checks to 76PW and REMS.  See, e.g., Fowler, 91 F.3d
at 1375 (client was entitled to rely on attorney's representations based on their fiduciary
relationship).  Nothing in the record on summary judgment indicates that Mrs. Marks's
reliance on Mr. Hentges's advice based on his twenty year relationship with her family was
not justified.

However, contrary to Mrs. Marks's argument, the issue of justifiable reliance is not
established by collateral estoppel.  Even if the Revocation Order is eventually properly
supported by the judgment roll, it does not appear that a finding of justifiable reliance on Mr.
Hentges's representations, or lack thereof, by Mrs. Marks was necessary to the Insurance
Commission's decision to revoke Mr. Hentges's insurance license or to levy a fine against
him.

Thus, the issue of justifiable reliance is an issue of fact to be determined at trial.

4.      *As a result of the reliance, the creditor suffered a loss*

Mr. Hentges's main argument is that he entitled to summary judgment because he did
not personally benefit from the Notes.  Defendant's Brief at 8.  Section 523(a)(2)(A) excepts
from discharge any debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent *obtained by*–
>
> > (A) false pretenses, a false representation, or actual fraud, other
> > than a statement respecting the debtor's or an insider's financial
> > condition.

26

11 U.S.C. § 523(a)(2)(A) (emphasis added).  A majority of circuit courts that have addressed the issue have held that Section 523(a)(2)(A) excepts from discharge *all losses* incurred by the creditor as a result of the debtor's fraud.  Consequently, a non-dischargeable debt under Section 523(a)(2)(A) is not measured by the amount the debtor benefitted from the fraud, but by the loss to the creditor proximately caused by the fraud.

In Pleasants v. Kendrick (In re Pleasants), 219 F.3d 372 (4th Cir. 2000), the debtor represented to the plaintiff creditors that he was a licensed architect who had graduated from a noted school of architecture.  Relying upon the representation, over the course of five years, the creditors hired the debtor to advise them of architectural options, to design their home and prepare architectural plans, to obtain construction estimates, and finally, to act as their construction contractor.  When the construction project faltered, the creditors learned that the debtor was not a licensed architect and had not attended architecture school.  Although the creditors gave the debtor another chance to succeed in the project, the debtor failed to meet any construction deadlines, and what had been constructed was shoddy and dangerous.  The creditors sued the debtor in state court for fraud, negligence and breach of contract.  Shortly before trial, the debtor filed bankruptcy, and the creditors sought to except the debt under Section 523(a)(2) and (a)(6).  The bankruptcy court awarded the creditors judgment in excess of $1 million, which it declared non-dischargeable pursuant to Section 523(a)(2).

Like Mr. Hentges, the debtor claimed that Section 523(a)(2) excepted from discharge only debt resulting from money or property transferred to the debtor (*i.e*., money "obtained by" the debtor through fraud), not the amount the creditor lost after paying third parties to

27

correct and complete the project. Id. at 375. The Fourth Circuit roundly rejected the debtor's argument, concluding that "'all liability arising from fraud'" was non-dischargeable. Id., *quoting* Cohen v. de la Cruz, 523 U.S. 213, 218 (1998). "Section 523(a)(2)(A) bars discharge of debts resulting from or traceable to fraud." Id. (quotations and citations omitted). "This language is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor." Id.

Also citing Cohen, the Fifth Circuit has held that innocent partners who were found vicariously liable for a culpable partner's fraud could not discharge their liability to the creditor, even though they did not benefit from their partner's fraud. See Deodati v. M.M. Winkler & Assoc. (In re M.M. Winkler & Assoc.), 239 F.3d 746 (5th Cir. 2001). Cohen "suggests that receipt of benefits is irrelevant to whether innocent debtors may discharge fraud liability." Id. at 749. Cohen also indicates "that we should not read requirements like receipt of benefits into § 523(a)(2)(A) and that discharge exceptions protect fraud victims rather than debtors." Id.

Joining the Fourth and Fifth Circuits, the Ninth Circuit recently reversed its position that "the debtor must have received a direct or indirect benefit from his or her fraudulent activity in order to make out a violation of § 523(a)(2)(A)." Muegler v. Bening, 413 F.3d 980, 983-84 (9th Cir. 2005), *cert. denied*, 546 U.S. 1139 (2006). "It is only the fact of an adverse fraud judgment, and nothing more, that is required for a debt to be nondischargeable. Accordingly, we find that in light of Cohen, the receipt of a benefit is no longer an element of fraud under § 523(a)(2)(A)." Id. at 984.

Since the issuance of the <u>Cohen</u> decision by the United States Supreme Court, the Tenth Circuit has not had the opportunity to address the issue of whether the statutory language "obtained by" requires that the money or property procured by fraud flow directly or indirectly to the debtor.  However, in 1996, when the Tenth Circuit outlined the elements of a Section 523(a)(2)(A) claim in <u>Fowler</u>, it merely required that the debtor's false representation upon which the creditor relied "cause[] the creditor to sustain a loss." <u>Fowler</u>, 91 F.3d at 1373.  It appears that the Tenth Circuit has never expressly held that the fraud had to result in a benefit to the debtor in order to except the debt from discharge.

In any event, this Court concurs with the Fourth, Fifth and Ninth Circuits that the line of cases endorsing the proposition that a debt "obtained by" fraud is non-dischargeable only to the extent that the debtor directly or indirectly received a benefit as a result of the fraud[14] has been abrogated by the United States Supreme Court's <u>Cohen</u> decision.[15]

---

[14]<u>See, e.g.</u>, <u>Brady v. McAllister (In re Brady)</u>, 101 F.3d 1165, 1172 (6th Cir. 1996) (the court collected cases holding that a creditor must show that the debtor must have directly or indirectly obtained some financial benefit as a result of fraud in order to prevail on a Section 523(a)(2)(A) claim, while recognizing a contrary view, but avoided deciding whether benefit to the debtor is a requirement because the debtor did receive the benefit from the fraud in that case).

[15]The Court further concurs with the thoughtful opinion issued by Bankruptcy Judge Donald Cordova in <u>Nat'l Development Serv., Inc. v. Denbleyker (In re Denbleyker)</u>, 251 B.R. 891 (Bankr. D. Colo. 2000), in which he chronicled the development and adoption of the "benefit to debtor" approach by various levels of courts, and examined how the approach conflicted with the <u>Cohen</u> decision in three significant aspects, and therefore could no longer be considered a valid element of Section 523(a)(2)(A) jurisprudence.

Mrs. Marks clearly suffered a loss.  76 PW filed bankruptcy and Mrs. Marks was sued by the bankruptcy trustee to recover, as a preference, funds that were repaid on Note A by 76 PW.  REMS ceased doing business and transferred its assets to another entity; as Mr. Hentges explained to Mrs. Marks at the February 15, 2005, Meeting, REMS was defunct and would never repay the Notes.  Mr. Hentges has failed to honor his guaranty of the indebtedness.  Regardless of whether Mr. Hentges benefitted from the Notes, Mrs. Marks has suffered a loss on account of fraud she alleges was perpetrated by Mr. Hentges.  Thus, Mr. Hentges has failed to negate the final element of Mrs. Marks's Section 523(a)(2)(A) claim.

### 5.    *Statement of financial condition*

Mr. Hentges also argues that Mrs. Marks "seemed to claim at various times that Mr. Hentges used some level of puffery regarding his financial circumstances" and as such, alleges a misrepresentation of Mr. Hentges's financial condition, which is an exception to Section 523(a)(2)(A).  Section 523(a)(2)(A) does except from its scope false "statement[s] respecting the debtor's or an insider's financial condition."   11 U.S.C. § 523(a)(2)(A). However, under Section 523(a)(2)*(B)* debts obtained by the use of a false statement of financial condition are non-dischargeable, but only if the financial statement was made in writing.  See Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 704 (10th Cir. 2005).

However, the Tenth Circuit has made clear that the phrase "respecting the debtor's or an insider's financial condition" contained in Section 523(a)(2)(A) and (B) is limited to "[s]tatements that present a picture of a debtor's overall financial health . . . analogous to balance sheets, income statements, statements of changes in overall financial position, or

30

income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." Id. at 714.  The statement alleged to be false must contain "information as to the debtor's or insider's overall net worth or overall income flow." Id.  In the Joelson case, the Tenth Circuit held that the debtor's false representations concerning her ownership of certain assets was not analogous to a statement of overall financial health.  Further, the debtor's false representation that she would receive funds from her brother to repay the loan did not purport to be a complete statement of her income.  Consequently, the Court held that the false statements were not "statements respecting the debtor's . . . financial condition," and therefore the debtor's oral misrepresentations were sufficient to render the debt non-dischargeable pursuant to Section 523(a)(2)(A).

Mrs. Marks is not complaining that Mr. Hentges provided her with a false statement, oral or written, of his overall net worth or income.  Thus, the Court concludes that the exception to Section 523(a)(2)(A) is not applicable and summary judgment in favor of Mr. Hentges on that ground is not appropriate.

C.      Section 523(a)(6)

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  Mr. Hentges contends that because Mrs. Marks does not allege any damage to her property, she has failed to state a claim under Section 523(a)(6).  Defendant's Brief at 11.  In her Response, Mrs. Marks argues that Mr. Hentges "converted" her property and that the

31

Judgment by Confession and Revocation Order conclusively establish that Mr. Hentges willfully and maliciously converted her property.  Plaintiff's Response at 12-14.

"Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.  The general rule in Oklahoma is that only *tangible* personal property may be converted.  Conversion does not lie for a debt."  Welty v. Martinaire of Oklahoma, Inc., 1994 OK 10, 867 P.2d 1273, 1275.  For the same reason that the Court concluded that Mr. Hentges did not commit larceny, the Court concludes that Mr. Hentges did not convert property of Mrs. Marks when he induced her to loan money to 76 PW and REMS.  Mrs. Marks willingly loaned money to 76 PW and REMS by writing checks to their order and giving the checks to Mr. Hentges.  There is no allegation that Mr. Hentges did not deliver the checks to 76 PW and REMS, or that the checks were not deposited into the accounts of 76 PW and REMS.  If in fact Mr. Hentges did cause 76 PW and REMS to transfer money from their accounts to Mr. Hentges or entities under his control, as alleged by Mrs. Marks, the money was no longer property of Mrs. Marks  at the time of such a transfer, but rather was the property of 76 PW and REMS.

Thus, the Court concludes that Mr. Hentges has demonstrated the absence of any disputed material facts relating to the Section 523(a)(6) claim and entitlement to judgment as a matter of law.  Mrs. Marks has not submitted evidence that would place into controversy any element of the tort of "conversion."  Further, Mrs. Marks has not produced admissible evidence tending to show that Mr. Hentges injured Mrs. Marks personally or injured her

personal property.  Accordingly, the Court grants summary judgment to Mr. Hentges on Mrs. Marks's Section 523(a)(6) claim.

**VI.    Conclusion**

For the reasons stated above, judgment shall be entered in favor of Mr. Hentges and against Mrs. Marks on Mrs. Marks's claims under Sections 523(a)(4) and 523(a)(6). Summary judgment is denied with respect to Mrs. Marks's claim under Section 523(a)(2)(A).

**SO ORDERED** this 13th day of August, 2007.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT