<u>PUBLISH</u>

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

**Filed / Docketed**
**August 13, 2007**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HENTGES, MICHAEL E., | ) | **Case No. 06-10451-R** |
| | ) | **Involuntary Chapter 7** |
| Debtor. | ) | |

| | | |
|---|---|---|
| VIRGINIA D. MARKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. No. 07-1020-R** |
| | ) | |
| MICHAEL E. HENTGES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Before the Court is Plaintiff's Motion for Summary Judgment (Adv. Doc. 6), supported by Plaintiff's Corrected Memorandum in Support of Motion for Summary Judgment (Adv. Doc. 10) (the "Motion"), filed by Plaintiff Virginia D. Marks ("Mrs. Marks") on March 28, 2007, and the Corrected Response to Plaintiff's Motion for Summary Judgment (Adv. Doc. 18) (the "Response"), filed by Defendant Michael E. Hentges ("Mr. Hentges") on April 6, 2007.

**I.     Jurisdiction**

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c), made applicable to this proceeding by Bankruptcy Rule 7056. A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Wright *ex rel*. Trust Co. of Kansas v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001), *citing* Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670, *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Mrs. Marks, as the moving party, bears the initial burden of demonstrating an absence of a genuine issue of material fact *and* entitlement to judgment as a matter of law. See Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir. 2002), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

If Mrs. Marks meets her initial burden, the burden shifts to Mr. Hentges, as the nonmoving party, to "set forth specific facts showing that there is a genuine issue for trial." Spaulding, 279 F.3d at 904, *citing* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Liberty Lobby, 477 U.S. at 248. Mr. Hentges may not simply rest upon his pleadings to satisfy its burden. Liberty Lobby, 477 U.S. at 256. Rather, he must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, 218 F.3d

1190, 1197 (10th Cir. 2000), *quoting* Adler, 144 F.3d at 671.  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."  Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (quotations and citation omitted).

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  Reasonable inferences that may be made from the proffered evidentiary record should be drawn in favor of the non-moving party, in this case, Mr. Hentges.  See Adams, 233 F.3d at 1246.  However, "[i]f the [non-moving party's] evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587.  Conversely, even where a movant's facts are undisputed, if two reasonable factfinders could reach different conclusions or "ultimate inferences" from the undisputed facts, summary judgment is not warranted.  See Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1382 (10th Cir. 1980).

## III.    Record on Summary Judgment

The following material facts are uncontested and are supported by the record:

For approximately twenty years prior to 2005, Mr. Hentges acted as investment advisor and life insurance broker for Mrs. Marks and her now deceased husband, Leslie Marks, and as such, held a position of trust and confidence with respect to Mrs. Marks.

Motion, Statement of Undisputed Facts ("SUF") ¶ 1; Response, Response to Plaintiff's Alleged Undisputed Facts ("Response to SUF") ¶ 1.

Mr. Hentges was a licensed insurance broker.  On October 1, 1999, Mr. Hentges sold the Leslie D. Marks Trust a $410,000 whole life insurance policy through Columbus Life Insurance Company ("Columbus"), insuring the life of Virginia D. Marks (the "Life Insurance Policy").  The beneficiary of the policy is the Virginia D. Marks Trust.  SUF ¶ 2; Response to SUF ¶ 2 (does not controvert with admissible evidence).

In September through November 2003, Mr. Hentges approached the Marks for the purpose of securing a series of loans, which Mr. Hentges suggested to the Marks they could fund by borrowing against the Life Insurance Policy sold to them by Mr. Hentges.  Complaint (Adv. Doc. 1) ¶ 7; Answer (Adv. Doc. 4) ¶ 7.

The first note ("Note A"), dated September 9, 2003, memorialized the promise of 76 PW, LLC "to pay to Virginia Marks the principal sum of Twenty Five Thousand and No/100 Dollars ($25,000.00), together with interest thereon at the rate of Five Percent (5%) per month . . . due and payable on December 8, [2]003."  SUF ¶ 5; Response to SUF ¶ 5.  Mr. Hentges signed Note A as the Manager of 76 PW, LLC.  Note, attached to Complaint as Exhibit B.

The second note ("Note B"), dated September 23, 2003, memorialized the promise of Real Estate Marketing Services, LLC ("REMS") "to pay to Virginia Marks the principal sum of Fifty Thousand and No/100 Dollars ($50,000.00), together with interest thereon at the rate of Five Percent (2%) [sic] per month . . . due and payable on December 15, [2]003."  SUF

4

¶ 7; Response to SUF ¶ 7.  Mr. Hentges executed Note B as Manager of REMS.  Note, attached to Complaint as Exhibit C.  Mr. Hentges personally guaranteed the obligation owing under Note B.  SUF ¶ 8; Response to SUF ¶ 8.

The third note ("Note C"), dated November 18, 2003, memorialized the promise of REMS "to pay to Virginia Marks the principal sum of Twenty Five Thousand and No/100 Dollars ($25,000.00), together with interest thereon at the rate of Two Percent (2%) per month . . . due and payable on February 18, [2]003."  SUF ¶ 10; Response to SUF ¶ 10.  Mr. Hentges executed Note C as Manager of REMS.  Note, attached to Complaint as Exhibit D. Mr. Hentges personally guaranteed the obligation owing under Note C.  SUF ¶ 11; Response to SUF ¶ 11.

Mr. Hentges admitted on January 4, 2004, that Note A and Note B were past due and in default, but represented to the Marks that if REMS could borrow an additional $100,000, it could close several business deals and repay the principal and accrued interest on all the Notes.  SUF ¶ 12; Response to SUF ¶ 12 (not controverted by admissible evidence).

The fourth note ("Note D"), dated January 20, 2004, memorializes the promise of REMS to pay Mrs. Marks and her husband "the principal sum of One Hundred Thousand and No/100 Dollars ($100,000.00), together with interest thereon at the rate of Eight Percent (8%) per annum until all principal and interest due and owing are paid."  SUF ¶ 14; Response to SUF ¶ 14.  Mr. Hentges executed Note D as Manager of REMS.  Note, attached to Complaint as Exhibit E.  Mr. Hentges personally guaranteed the obligation owing under Note D.  SUF ¶ 15; Response to SUF ¶ 15.

5

Mrs. Marks received payments totaling $54,000 on the Notes described above. SUF ¶ 16; Response to SUF ¶ 16.[1]

By letter dated June 22, 2005, Mr. and Mrs. Marks, through their attorney, made demand for payment on all four Notes.  SUF ¶ 17; Response to SUF ¶ 17.

By letter dated June 27, 2005, Cy Northrop, attorney for Mr. Hentges, responded to the demand letter admitting Mr. Hentges's liability on the Notes. Through the letter, Mr. Hentges offered to enter into a settlement of his liability on the Notes, which included a reduction in the amount then due, a cancellation of the four Notes, and the execution by Mr. Hentges of a new installment note extending repayment of the reduced amount over three years with six percent interest.  SUF ¶ 18; Response to SUF ¶ 18.  Mr. Northrop also stated that Mr. Hentges was unable to make a payment at that time, that if he lost his insurance license his ability to pay would be hampered, that he would not pay the "high interest rates called for in the notes," that he would not make a partial payment on a past due note, and that he would not pay if he was sued by the Marks.  Letter, Exhibit F to Verified Petition (Exhibit 1) attached to Motion; Response to SUF ¶ 18.

---

[1]The parties assert that $54,000 was paid by Mr. Hentges.  Although not set forth in the Motion, the Court takes judicial notice of Adversary Proceeding No. 06-1185-R, <u>Steven W. Soule, Trustee,  v. Virginia D. Marks</u>, in which Mrs. Marks was sued by the trustee of the bankruptcy estate of 76 PW, LLC, in order to recover $27,636.71 from Mrs. Marks as a preferential payment made within ninety days prior to the date Mr. Hentges authorized 76 PW, LLC, to file its bankruptcy petition.  The trustee alleged that within the preference period, 76 PW, LLC paid $27,636.71 to Mrs. Marks in repayment of Note A. Mrs. Marks alleged that Mr. Hentges transferred funds to 76 PW, LLC, to make the payment and therefore the payment was actually made with Mr. Hentges's funds, not those of 76 PW, LLC.  The Court further notes that Mrs. Marks and the trustee settled the proceeding under terms in which Mrs. Marks will pay $11,909.00 to the trustee.

On July 1, 2005, Mr. and Mrs. Marks filed a lawsuit against Mr. Hentges and the makers of the Notes in the District Court for Tulsa County, Oklahoma (the "Tulsa County Lawsuit"), alleging, *inter alia,* a claim on each Note, including a claim against Mr. Hentges on his guarantee, and claims against Mr. Hentges for fraud, negligence, professional negligence and breach of fiduciary duties.  SUF ¶ 19 and Verified Petition, Exhibit 1 to Motion; Response to SUF ¶ 19.

With respect to the fraud claim, Mrs. Marks alleged –

65.    As the financial advisor for the Marks for the last twenty (20) years, Hentges has held a position of trust and confidence.

66.    Between September 9, 2003, and January 20, 2004, Hentges, individually and as agent of Columbus, 76 PW, and REMS, used his position of trust and confidence to fraudulently coerce the Marks into advancing four (4) loans totaling $200,000, which were funded pursuant to a transaction arranged by Hentges utilizing his agency relationship with Columbus to obtain the principal of the note from the Life Insurance Policy.

67.    As inducement for the Marks to provide each loan, Hentges willfully and intentionally misrepresented the date that all principal and accrued interest under each promissory note would be paid in full.

68.    The Marks relied on Hentges's misrepresentations when they advanced each loan.

69.    As inducement for the Marks to provide the loan with respect to Note D, Hentges willfully and intentionally misrepresented the date that all principal and interest under Note A and Note B would be paid in full.

70.    The Marks relied on Hentges's misrepresentations when they advanced the loan related to Note D.

71.    By letter from Cy Northrop dated June 27, 2005, the Marks are now informed that unless they agree to renegotiate the promissory notes, "the Marks will never get paid."

72.     As a direct result of the fraudulent misrepresentations made by Hentges, the Marks have been damaged in an amount in excess of $10,000, plus attorney's fees and costs.

Verified Petition, Exhibit 1 to Motion.

Mr. Hentges filed an Answer in the Tulsa County Lawsuit and asserted a Counterclaim against the Marks, contending that they had "extorted" a $54,000 payment from Mr. Hentges by filing administrative complaints against Mr. Hentges with the Oklahoma Insurance Commissioner and the Oklahoma Department of Securities.  SUF ¶ 20; Response to SUF ¶ 20.

In the Tulsa County Lawsuit, Mr. Hentges filed an Offer of Judgment on August 31, 2005, which stated, *in toto*, that "Pursuant to Oklahoma Statutes Title 12 Section 1101.1(B), Michael E. Hentges offers to confess a judgment in the amount of $185,000.00, exclusive of any fees or costs deemed to be recoverable[.]" SUF § 21 and Offer of Judgment, Motion Exhibit 3; not controverted.  The Marks accepted the Offer of Judgment on September 2, 2005, and on September 21, 2005, the Tulsa County District Court entered a "Judgment by Confession."  SUF ¶ 22; Judgment by Confession, Motion Exhibit 4; not controverted.[2]

_____

[2]Mr. Hentges objects to and moves to strike SUF ¶¶ 21 and 22, contending that pursuant to section 1101.1 of title 12, the Offer of Judgment and Mrs. Marks's acceptance thereof is inadmissible.  Section 1101.1(D) states that "[e]vidence of an offer of judgment or a counteroffer of judgment shall not be admissible in any action or proceeding for any purpose except in proceedings to enforce a settlement arising out of an offer of judgment or counteroffer of judgment, or to determine reasonable attorneys fees and reasonable litigation costs under this section."  12 O.S. § 1101.1(D).  The Court concludes that because this is an action to enforce a settlement arising out of an offer of judgment, Section 1101.1(D) explicitly allows the admission of evidence of the Offer of Judgment, the acceptance of the Offer of Judgment, and the Judgment by Confession.  Thus, Mr. Hentges's motion to strike SUF ¶¶ 21 and 22 is denied.

The Judgment by Confession states, in pertinent part–

Comes now, Plaintiffs Virginia D. Marks, individually and as Trustee of the Virginia D. Marks Trust and Leslie D. Marks, individually and as Trustee of the Leslie D. Marks Trust ("Plaintiffs") and advise the Court that Defendant, Michael E. Hentges, has offered to confess Judgment in the amount of $185,000.00 and Plaintiffs have accepted the offer of confession, as evidenced by the Notice of Acceptance of Offer to Confess Judgment filed on September 2, 2005.  The Plaintiffs have requested that the Court enter this Judgment by Confession.  For good cause and proper grounds presented the Court FINDS that this Judgment by Confession should be approved.

IT IS THEREFORE ORDERED that Plaintiffs are awarded judgment against Michael E. Hentges in the sum of $185,000.00 for which general execution shall issue and interest shall accrue at the rate of 7.25% as provided in 12 O.S. § 727[I].

Judgment by Confession, Motion Exhibit 4.  Mr. Hentges dismissed his Counterclaim without prejudice.  SUF ¶ 22; not controverted.

Mr. Hentges has not paid any of the Judgment by Confession.  SUF ¶ 25; Response to SUF ¶ 25.

On September 28, 2005, Mr. Hentges appeared before an administrative law judge (the "ALJ") for the Oklahoma Insurance Commission for a hearing based upon complaints filed by Mrs. Marks and another individual.  Order Revoking Licence of Michael Edmund Hentges ("Revocation Order"), Motion Exhibit 6.[3]  After a hearing on the merits, on October 27, 2005, the ALJ entered the Revocation Order based in part upon the following findings of fact and conclusions of law:

---

[3]Although Mr. Hentges disagrees with the findings of fact contained in the Revocation Order, he does not controvert the fact that the order was entered.

5.      [Mr. Hentges] used his relationship as the insurance agent and financial advisor to induce Mrs. Marks to make the above loans. . . .

*****

8.      In his dealings with Mrs. Marks, [Mr. Hentges] was dishonest in his promises of repayment of loans and in the transfer of those funds from one business to another which he either owned or had a financial interest.  As her insurance agent, he breached his fiduciary relationship to the detriment of Mrs. Marks and to his benefit and that of his business ventures.

*****

Conclusions of Law

*****

3.      The evidence presented is clear and convincing that [Mr. Hentges] had a fiduciary relationship with Mrs. Marks as an insurance client, that he did not make a full disclosure as to how the money was to be used, that he did not advise as to the viability of Real Estate Marketing Services, and that he was untruthful when he made the terms of repayment and defaulted on the first payment of each note.  If not dishonest, then he was an incompetent businessman.

*****

5.      The evidence is clear and convincing that [Mr. Hentges] used dishonest practices in the borrowing of money from Mrs. Marks and Ms. Kelly for enterprises in which he had a substantial financial interest including some which could not pay its bills.

6.      The evidence clearly shows [Mr. Hentges's] untrustworthiness and incompetence in using information he had about the financial affairs of Mrs. Marks and Ms. Kelly to borrow money for ventures in which he had a substantial interest and for his benefit and his failure to repay and [by] defaulting on the first payment dates.

7.      [Mr. Hentges] was dishonest in his dealings with them and showed a total lack of integrity and honesty, which are character traits essential to a person being licensed as an insurance producer in the State of Oklahoma.

Revocation Order.[4]  The Revocation Order was affirmed on Mr. Hentges's appeal to the District Court for Oklahoma County.  SUF ¶ 24; Order dated October 4, 2006, Motion Exhibit 7; not controverted.  The District Court found "substantial evidence to support the decision of the hearing officer[,] . . . [that] Appellant's rights were not prejudiced [, and that] Appellant had clear notice of everything proffered" at the Commission proceeding.  Order at 1.

## IV.    Defendant's Statement of Additional Facts

Mr. Hentges contends that certain testimony by Mrs. Marks conflicts with findings and conclusions of the ALJ, namely that she did not believe that Mr. Hentges was ever dishonest or deceitful. Response, Defendant's Statements of Undisputed Facts ("DSUF") ¶ 1.  The Court has read the transcript of Mrs. Marks's testimony that is cited by Mr. Hentges for this proposition.  In response to questioning by Mr. Hentges's counsel, Mrs. Marks stated that she did not feel Mr. Hentges was "dishonest" or that he "deceived" her and she also answered "no" when asked by Mr. Hentges's counsel whether she has evidence that Mr. Hentges "is a fraud or a crook or a thief or anything like that."  Id.   However, Mrs. Marks also admits that she is unaware of the legal boundaries of the term "fraud."  Id.

Mr. Hentges also contends that he did not receive the money loaned by Mrs. Marks (DSUF ¶ 4); that he did not own any part of REMS (DSUF ¶ 5); that he guaranteed only the three Notes issued by REMS (DSUF ¶ 6); and that prior to the Tulsa County Lawsuit, he

---

[4]Mr. Hentges objects to the relevance of the Revocation Order.  Response to SUF ¶ 23.  Concluding that the Revocation Order would be relevant and admissible at trial, the Court overruled the objection.

offered to pay Mrs. Marks the full balance on the Notes by issuing a replacement note (DSUF ¶ 7).[5]

As Mrs. Marks has not controverted any of Mr. Hentges's Statements of Undisputed Facts, for the purposes of summary judgment only, the Court will consider these statements true.

## V.   Conclusions of law

As the sole basis for summary judgment, Mrs. Marks contends that by virtue of collateral estoppel, the Judgment by Confession and the Revocation Order establish all elements of her claims to except Mr. Hentges's debt to her from discharge.  Mr. Hentges argues that judgments and orders entered prior to bankruptcy do not have *res judicata* effect on the issue of dischargeability.  Although Mr. Hentges is correct that a pre-bankruptcy judgment cannot be given *res judicata* effect to establish a creditor's non-dischargeability claim (because such a claim does not arise, and therefore could not have been litigated, until after a bankruptcy is filed), his argument fails to address the contention raised by Mrs. Marks– that certain issues of fact and law were established by the pre-bankruptcy judgment and order, and that *collateral estoppel* precludes Mr. Hentges from disputing those issues, and that the conclusively determined issues establish all the elements of Mrs. Marks's non-dischargeability claims.  Because the doctrines of *res judicata* and collateral estoppel have

_____

[5]The Court notes again that Mr. Hentges offered to execute a new note for a reduced amount at a lower interest rate in exchange for a cancellation of the original Notes (and a release of the original payors), which is not the same as an offer *to pay* the Notes in full.

been invoked indiscriminately by the parties, a discussion of the application of each doctrine in the context of a Section 523(a) proceeding is appropriate.

A.   An Overview of the Application of Claim and Issue Preclusion Doctrines in Section 523(a) Proceedings

Mr. Hentges invokes <u>Brown v. Felsen</u>, 442 U.S. 127 (1979), for the broad proposition that "*res judicata* does not apply to the determination of dischargeability, even when there exists a consent judgment resolving similar issues." Response at 11. It is true that the United States Supreme Court has consistently held that default and consent judgments that reduce a debtor's debt to judgment do not preclude the *judgment creditor* from later alleging that the original debt was procured by fraud, or that it arose as a result of a breach of fiduciary duty or the result of a willful and malicious act. <u>See</u> <u>Brown</u>, 442 U.S. at 138-39. "[T]he mere fact that a conscientious creditor has reduced its claim to judgment should not bar further inquiry into the true nature of the claim." <u>Brown</u>, 442 U.S at 138.[6] Accordingly, a *judgment creditor* is not precluded from raising claims relevant to dischargeability, such as fraud, false pretenses, defalcation, etc., even if they were not alleged or litigated in a prior state court lawsuit seeking the liquidation of a debt, because until a bankruptcy is filed, such issues may not be ripe, or it may be simpler and more cost effective to sue and obtain a judgment or settlement on a contract theory, even though the creditor could have liquidated the same debt

---

[6]In addition, when a debtor agrees to pay a compromised amount in exchange for dismissal with prejudice of a creditor's fraud lawsuit, the creditor is not precluded from later alleging in a Section 523(a) proceeding that the compromised debt was originally procured by fraud. <u>See</u> <u>Archer v. Warner</u>, 538 U.S. 314, 323 (2003).

alleging fraud or an intentional tort.  The Tenth Circuit has "recognized that the issues presented in a state court action on a debt are quite different from those presented in an action to prevent discharge" and that "[f]orcing a creditor to anticipate a hypothetical bankruptcy filing in his state court action on the debt and therefore to pursue all potential claims relevant to discharge in addition to those necessary to establish the debt would frequently entail needless additional litigation." Resolution Trust Corp. v. McKendry (In re McKendry), 40 F.3d 331, 335 (10th Cir. 1994).

The precise question addressed in McKendry was: "[W]here a debt has been reduced to judgment in state court, can the bankruptcy court be barred by a state statute of limitations from considering the underlying nature of the debt in determining whether the debt is dischargeable?" Id. at 334.  Based upon the policy that a creditor cannot be prejudiced by failing to litigate all elements of possible discharge exceptions that have not even arisen when seeking to establish a debt in state court, the Tenth Circuit held that a creditor who obtained a state court judgment establishing a debt arising out of certain stock transactions, and who did not specifically plead fraud in the state court action, was not precluded from pleading and proving fraud in a dischargeability adversary proceeding, notwithstanding that a cause of action for fraud would otherwise have been barred by the state law statute of limitations. Id. at 336.  The Tenth Circuit reasoned that "'[i]n bankruptcy court there are two separate and distinct causes of action: One cause of action is on the debt and the other cause of action is on the dischargeability of that debt, a cause of action that arises solely by virtue of the Bankruptcy Code and its discharge provisions." Id. (quotations and citations omitted).

14

So long as the complaint contesting discharge of the debt based on fraud was filed within the time parameters established for filing a Section 523 complaint under the Bankruptcy Code and Bankruptcy Rules, it is timely.  Id. at 337.  See also Ullman v. Boyer (In re Boyer), No. 98-3112, 1999 WL 33954735 (E.D. Va. Aug. 24, 1999), at *7-9.

In summary, based on the above-cited authorities, a *debtor* cannot bar a *judgment creditor* from asserting an exception to discharge on the ground that (1) a default, consent or confessed judgment does not articulate the claim or claims resolved by the judgment; (2) the prior lawsuit asserting intentional tort claims was dismissed and the debt arising from intentional tort was replaced with a debt arising from a breach of contract (*i.e.*, breach of the settlement agreement); (3) in the prior lawsuit producing the judgment that liquidated the debt, the creditor did not assert fraud, embezzlement, defalcation by a fiduciary, or willful and malicious conduct; or (4) the state statute of limitations on fraud, intentional torts, embezzlement or defalcation expired prior to the deadline for filing a Section 523(a)(2), (4) or (6) complaint.[7]

In this case, however, the issue is whether *Mrs. Marks* (the judgment creditor) may use the judgment and order to establish elements of her Section 523(a) claims.  The issue resolved in Brown was whether the debtor could assert *res judicata* as a *defense* to preclude a creditor from pursuing a claim for an exception to the discharge if the creditor had not

---

[7]Obviously, if in a prior lawsuit alleging intentional torts, the creditor's claims were actually litigated and a judgment on the merits was entered *in favor of the debtor*, the debtor may assert preclusion to bar relitigation of *issues* that were actually decided by the state court.  See Grogan v. Gardner, 498 U.S. 279, 284 n.11 (1991).

established the elements of the exception to discharge when reducing its claim to a judgment prior to the debtor's bankruptcy.  The Brown case stands for the proposition that a creditor is free to establish that the debt reduced to judgment was the result of a debtor's fraud or intentionally tortious conduct, even if the creditor did not assert fraud or intentional torts in the prior lawsuit, because "considerations material to discharge are irrelevant to the ordinary collection proceeding.  The creditor sues on the instrument which created the debt."  Brown, 442 U.S. at 134-35.  Thus, Mr. Hentges's citation of Brown is inapposite to the issue before the Court.

While a prior judgment will not preclude a creditor from establishing an exception to discharge claim if such claim was not litigated in connection with the pre-bankruptcy judgment (*i.e.*, *res judicata* (claim preclusion) does not apply), collateral estoppel (issue preclusion) may nonetheless be asserted by a judgment creditor to establish some or all elements of its non-dischargeability claim.  See Grogan v. Gardner, 498 U.S. 279, 285 n.11 (1991) ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).");  Klemens v. Wallace (In re Wallace), 840 F.2d 762, 764-65 (10th Cir. 1988).  A federal court must give a state court judgment and a state administrative determination the same preclusive effect to which it would be entitled in the state the judgment or determination was rendered.  See Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1374 (10th Cir. 1996), *citing* Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 381-83 (1985) ("holding that in cases exclusively within federal jurisdiction, state law determines the preclusive effect of a prior state court judgment unless

16

an exception to 28 U.S.C. § 1738, the full faith and credit statute, applies"); Amoco Prod. Co. v. Heimann, 904 F.2d 1405, 1414 (10th Cir. 1990) ("Where a state agency acts in a judicial capacity, resolves facts properly before it and the parties have had an adequate opportunity to litigate, we accord the agency's decision the same preclusive effect to which it would be entitled in the state's courts.").  Thus, a creditor holding a state court judgment (or administrative order) may be entitled to assert collateral estoppel offensively to establish certain elements of its Section 523 claim if a state court would recognize the judgment as issue preclusive.

Here Mrs. Marks contends that certain issues relevant to her Section 523 complaint, namely fraud and breach of fiduciary duty, were conclusively adjudicated in the Judgment by Confession (a state court consent judgment) and/or in the Revocation Order entered by the Oklahoma Insurance Commission, which was affirmed by a state district court, and that Mr. Hentges is barred from contesting those determinations.

     B.     Preclusive Effect of the Judgment by Confession

Because the Judgment by Confession was entered by an Oklahoma district court, the Court must determine the extent to which an Oklahoma court would accord the judgment preclusive effect.  Fowler, 91 F.3d at 1374.[8]  Oklahoma courts follow the principles stated in the Restatement (Second) of Judgments in applying collateral estoppel.  "When an issue

_____

[8]Cases cited by Mrs. Marks in support of her contention that "confessed judgments based on fraud claims can collaterally estop a debt from discharging the debt supported by the judgment" are inapposite because those cases are governed by federal law or the law of states other than Oklahoma.

of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Salazar v. City of Oklahoma City, 1999 OK 20, 976 P.2d 1056, 1060 n.6, *quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). Moreover, in Oklahoma, "when an issue (or claim) is sought to be barred by an earlier judgment in another case, the party relying on the adjudication *dehors* the case then before the trial court must secure admission (for the record on appeal) of the entire judgment roll (or record proper) in the other case. This rule applies whether a favorable decision on the point is sought by summary relief or by trial." Id. at 1061 n.12.[9]

It does not appear that Mrs. Marks produced the entire judgment roll with respect to the Judgment by Confession, as the record on summary judgment does not contain evidence of the process or return of service. In this case, however, in light of the fact that Mr. Hentges answered the Verified Petition (Answer of Michael E. Hentges, Motion, Exhibit 1) and did not allege either in his Answer in the Tulsa County Lawsuit or in his Response herein that he was not properly served, the Court finds the deficiencies in the judgment roll to be immaterial for the purposes of Mrs. Marks's Motion.

The threshold issue in determining whether the Judgment by Confession may be accorded preclusive effect is whether the issue sought to be conclusively established was

---

[9]The judgment roll or record proper "shall be made up from the petition, the process, return, the pleadings subsequent thereto, reports, verdicts, orders, judgments, and all material acts and proceedings of the court. . . ." Salazar, 976 P.2d at 1061 n.11, quoting 12 O.S. § 32.1.

"actually litigated."  The Comments to the Restatement provide that when a "judgment is entered by confession, consent, or default, none of the issues is actually litigated.  Therefore, the rule of this Section [27] does not apply with respect to any issue in a subsequent action.  The judgment may be conclusive, however, with respect to one or more issues if the parties have entered an agreement manifesting such an intention."  RESTATEMENT (SECOND) OF JUDGMENTS § 27, Comment (e).

The Tenth Circuit held in a similar fashion in Fowler.  In analyzing whether New Mexico's courts would grant preclusive effect to the consent judgment at issue in Fowler, the Tenth Circuit found that New Mexico had not yet addressed the issue.  However, the Tenth Circuit "recognized 'that consent decrees are of a contractual nature and, as such, their terms may alter the preclusive effects of a judgment.'" Fowler, 91 F.3d at 1376, quoting May v. Parker-Abbott Transfer & Storage, Inc., 899 F.2d 1008, 1010 (10th Cir. 1990).  Because the parties themselves craft the terms of a consent judgment, the Tenth Circuit held that a consent judgment would not render any particular issues conclusively adjudicated for the purposes of preclusion unless preclusion was agreed upon by the parties either in a settlement agreement or in the consent judgment itself (or, perhaps, as shown by extrinsic evidence).  Fowler, 91 F.3d at 1376-77.

Likewise, Oklahoma courts have not specifically addressed whether a consent or confessed judgment meets the "actually litigated" prong required for issue preclusion, but this Court observes that the position taken by the Restatement commentators and the Tenth Circuit in Fowler, i.e., that a consent or confessed judgment generally does not preclude

19

relitigation of issues, but may preclude relitigation if the parties manifested such an intention at the time the judgment was entered, is the position adopted in a majority of jurisdictions.[10] This Court concludes, therefore, that Oklahoma courts would follow the Restatement rule, and hold that the Judgment by Confession does not conclusively establish that Mr. Hentges is liable to Mrs. Marks on account of fraud or breach of fiduciary duty.  Accordingly, summary judgment cannot be entered in favor of Mrs. Marks based on the Judgment by Confession.

C.      Preclusive Effect of the Revocation Order

In the Revocation Order, the ALJ found that:

_____

[10]See "Modern Views of State Courts as to Whether Consent Judgment is Entitled to Res Judicata or Collateral Estoppel Effect," 91 ALR 3d 1170, §§ 6[a], 6[b] and 6[c] (1979 and Supp. 2007).  See also Factoring of Oklahoma, LLC v. Jessee (In re Jessee), Adv. No. 05-1241-R, 2006 WL 2861195 (Bankr. N.D. Okla. Oct. 5, 2006), at **7-8.

In some cases, however, courts have concluded that a confessed judgment may meet the "actually litigated" requirement if the defendant confesses judgment at or on the eve of trial, after having fully participated in the proceedings and, perhaps, realizing the futility of defending at trial.  In such a case, a defendant generally is not confessing judgment solely for the purpose of avoiding the time and expense of defending, and it is unfair to the plaintiff, who has spent time, effort and funds litigating a claim to be deprived, at the option of the defendant, of the conclusiveness of findings and conclusions that would have supported a judgment after trial.  See, e.g., Nissan v. Weiss (In re Weiss), 235 B.R. 349, 357 (Bankr. S.D.N.Y. 1999) (predicting Texas preclusion law).

The Court need not decide whether Oklahoma courts would follow the reasoning set forth in Weiss because this case is factually distinguishable.  Mr. Hentges did not confess judgment on the eve of trial; rather he made an offer to confess judgment approximately one month after the Tulsa County Lawsuit was commenced through the mechanism of 12 O.S. § 1101.1, which encourages litigants to make early and reasonable settlement offers by requiring a plaintiff to pay the fees the defendant could have avoided by acceptance of the settlement if the plaintiff is eventually awarded less than the settlement offer.  Unlike the plaintiff in Weiss, Mrs. Marks was not prejudiced by a confession of judgment following years of active pretrial litigation.

      5.      [Mr. Hentges] used his relationship as the insurance agent and financial advisor to induce Mrs. Marks to make the above loans.

      8.      In his dealings with Mrs. Marks, [Mr. Hentges] was dishonest in his promises of repayment of loans and in the transfer of those funds from one business to another which he either owned or had a financial interest.

Further, the ALJ concluded  —

      3.      The evidence presented is clear and convincing that [Mr. Hentges] had a fiduciary relationship with Mrs. Marks as an insurance client, that he did not make a full disclosure as to how the money was to be used, that he did not advise as to the viability of Real Estate Marketing Services, and that he was untruthful when he made the terms of repayment and defaulted on the first payment of each note.  If not dishonest, then he was an incompetent businessman.

      5.      The evidence is clear and convincing that [Mr. Hentges] used dishonest practices in the borrowing of money from Mrs. Marks and Ms. Kelly for enterprises in which he had a substantial financial interest including some which could not pay its bills.

      6.      The evidence clearly shows [Mr. Hentges's] untrustworthiness and incompetence in using information he had about the financial affairs of Mrs. Marks and Ms. Kelly to borrow money for ventures in which he had a substantial interest and for his benefit and his failure to repay and defaulting on the first payment dates.

      7.      [Mr. Hentges] was dishonest in his dealings with them and showed a total lack of integrity and honesty, which are character traits essential to a person being licensed as an insurance producer in the State of Oklahoma.

Revocation Order.

Under Oklahoma law, "[a] final adjudicative administrative decision may have the same preclusive effect as the judgment of a court provided that the proceeding in which the administrative decision is made meets the standards for preclusive effect applicable to judicial decisions."  State *ex rel*. Dept. of Transp. v. Little, 2004 OK 74, 100 P.3d 707, 719,

*citing* <u>Feightner v. Bank of Oklahoma, N.A.</u>, 2003 OK 20, 65 P.3d 624, 629. "Although generally, application of preclusion principles to final agency adjudicatory decisions is favored, one recognized exception is when there is a statutory intent or directive to the contrary." <u>Id</u>. Such statutory intent or directive may be express or implied, but "there must be at least some reliable indicia of such intent to allow successive relitigation of an essentially identical claim or issue anew in a different forum." <u>Id</u>. Section 1435.13 of Title 36 of the Oklahoma Statutes describes conduct constituting cause for revocation of an insurance producer's license, and provides that revocation hearings shall be held pursuant to the Oklahoma Administrative Procedures Act (the "OAPA"). Nothing in Section 1435.13 expresses or implies that findings made after an administrative hearing should be subject to relitigation in another forum.

The OAPA itself provides for notice of a complaint, including notice of the issues and rules involved, notice of an opportunity for parties to respond to the complaint, the right to representation by counsel, the right to a neutral hearing officer, the right to conduct discovery and obtain attendance of witnesses and production of documents by subpoena, the opportunity to present testimony, documentary evidence and argument and to cross-examine adverse witnesses, the right to submit proposed findings of fact and conclusions of law, a decision that articulates the hearing officer's findings of fact and legal conclusions, the right to seek reconsideration of an order and a stay of the order, and the right to judicial review of the decision by a district court. 75 O.S. §§ 309-23. Nothing in the OAPA indicates a statutory intent that findings and conclusions made in a final order after an administrative

hearing conducted in compliance with the OAPA should be subject to relitigation in another forum.  See also Feightner, 65 P.3d at 631.[11]  Thus, the Court concludes that Oklahoma courts would accord preclusive effect to the findings and conclusions made by the Oklahoma Insurance Commission after a hearing conducted in compliance with the OAPA and affirmed after judicial review.

Although it appears that the issues of fact and law recited above were actually litigated and determined by a valid and final order resulting in the revocation of Mr. Hentges's license to sell insurance, and the determinations were essential to the revocation order, the record on summary judgment does not contain the "judgment roll" or "record proper" from which this Court may determine the scope of the issues actually litigated in order to determine whether it may accord the findings and conclusions preclusive effect.  Although a "court can take judicial notice *of its own records* in litigation interconnected with a case before it, it cannot take judicial notice *of records in other courts*.  Those who rely on a judgment for its issue-preclusive force (or for any other consequence consistent with an earlier adjudication's legal efficacy) are duty-bound to produce – as proof of its terms, effect and validity – the *entire* judgment roll for the case which culminated in the decision invoked as a bar to relitigation."  Salazar, 976 P.2d at 1061 (emphasis original).  Because the record is insufficient to assess the preclusive effect of the Revocation Order, Mrs. Marks is not entitled to summary judgment on the basis of the Revocation Order.

---

[11]See also RESTATEMENT (SECOND) OF JUDGMENTS § 83 (1982 & SUPP. 2007).

## VI.     Conclusion

Because Mrs. Marks has not established entitlement to judgment as a matter of law, the Motion is denied.

**SO ORDERED** this 13th day of August, 2007.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT